IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | | |
|---|---|---|
| THOMAS BUTLER,<br>    Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Civil No. 3:17cv111 (HEH) |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of Social Security, | ) | |
|     Defendant. | ) | |
| | ) | |

REPORT AND RECOMMENDATION

On December 10, 2012, Thomas Weston Butler ("Plaintiff") applied for Social Security Disability Benefits ("DIB") under the Social Security Act ("Act"), alleging disability from cervicalgia related to Plaintiff's two neck surgeries, anxiety and migraine headaches, with an alleged onset date of April 3, 2012. The Social Security Administration ("SSA") denied Plaintiff's claims both initially and upon reconsideration. Thereafter, an Administrative Law Judge ("ALJ") denied Plaintiff's claims in a written decision and the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision as the final decision of the Commissioner.

Plaintiff now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g), arguing that the ALJ erred in assigning little or limited weight to the opinions of Plaintiff's treating physicians; failing to consider Plaintiff's work history in the credibility determination; and, failing to account for all of Plaintiff's mental impairments in the residual functional capacity ("RFC"). (Mem. in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s Mem.") (ECF No. 12) at 2-3.) This matter now comes before the Court for a Report and Recommendation pursuant to 28 U.S.C.

§ 636(b)(1)(B) on the parties' cross-motions for summary judgment, rendering the matter ripe for review.[1] For the reasons that follow, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 11) be GRANTED, that Defendant's Motion for Summary Judgment (ECF No. 13) be DENIED and that the final decision of the Commissioner be VACATED and REMANDED.

## I.    PROCEDURAL HISTORY

On December 10, 2012, Plaintiff protectively filed an application for DIB, with an alleged onset date of April 3, 2012. (R. at 88-89, 219-21.) The SSA denied these claims initially on February 26, 2013, and again upon reconsideration on January 22, 2014. (R. at 124, 136.) At Plaintiff's written request, the ALJ held a hearing on May 7, 2015. (R. at 38-87, 143.) On August 4, 2015, the ALJ issued a written opinion, denying Plaintiff's claims and concluding that Plaintiff did not qualify as disabled under the Act, because he could perform jobs existing in significant numbers in the national economy. (R. at 20-31.) On December 2, 2016, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision as the final decision of the Commissioner subject to review by this Court. (R. at 1-5.)

## II.    STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, a court "will affirm the Social Security Administration's disability determination 'when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence.'" *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d

---

[1]    The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments, and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

337, 340 (4th Cir. 2012)). Substantial evidence requires more than a scintilla but less than a preponderance, and includes the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Indeed, "the substantial evidence standard 'presupposes . . . a zone of choice within which the decision makers can go either way, without interference by the courts. An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.'" *Dunn v. Colvin*, 607 F. App'x. 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir. 1988)). To determine whether substantial evidence exists, the court must examine the record as a whole, but may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). In considering the decision of the Commissioner based on the record as a whole, the court must "take into account whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, bind the reviewing court to affirm regardless of whether the court disagrees with such findings. *Hancock*, 667 F.3d at 477. If substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

The Social Security Administration regulations set forth a five-step process that the agency employs to determine whether disability exists. 20 C.F.R. § 404.1520(a)(4); *see Mascio*, 780 F.3d at 634-35 (describing the ALJ's five-step sequential evaluation). To summarize, at step

3

one, the ALJ looks at the claimant's current work activity. § 404.1520(a)(4)(i). At step two, the ALJ asks whether the claimant's medical impairments meet the regulations' severity and duration requirements. § 404.1520(a)(4)(ii). Step three requires the ALJ to determine whether the medical impairments meet or equal an impairment listed in the regulations. § 404.1520(a)(4)(iii). Between steps three and four, the ALJ must assess the claimant's residual functional capacity ("RFC"), accounting for the most that the claimant can do despite his physical and mental limitations. § 404.1545(a). At step four, the ALJ assesses whether the claimant can perform his past work given her RFC. § 404.1520(a)(4)(iv). Finally, at step five, the ALJ determines whether the claimant can perform any work existing in the national economy. § 404.1520(a)(4)(v).

## III.    THE ALJ'S DECISION

On May 7, 2015, the ALJ held a hearing during which Plaintiff (represented by counsel) and a vocational expert ("VE") testified. (R. at 38-87.) On August 4, 2015, the ALJ issued a written opinion, finding that Plaintiff did not qualify as disabled under the Act. (R. at 20-31.)

The ALJ followed the five-step evaluation process established by the Social Security Act in analyzing Plaintiff's disability claim. (R. at 21-31.) At step one, the ALJ held that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of April 3, 2012. (R. at 22.) At step two, the ALJ found that Plaintiff had the following severe impairments: degenerative disc disease of the cervical and lumbar spine; neuropathy; headaches; anxiety; depression; and, opiate dependence. (R. at 22.) At step three, the ALJ held that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. 404, Subpart P, Appendix 1 (§§ 404.1520(d), 404.1525 and 404.1526). (R. at 23.)

4

In assessing Plaintiff's RFC, the ALJ found that Plaintiff could perform sedentary work with limitations. (R. at 24.) Plaintiff could never climb ropes, ladders or scaffolds. (R. at 24.) Plaintiff could occasionally climb ramps/stairs, balance, stoop, kneel, crouch and crawl, occasionally reach overhead and frequently finger and handle. (R. at 24.) The ALJ limited Plaintiff to simple, repetitive tasks and work environments with no more than moderate noise. (R. at 24.) At step four, the ALJ found that Plaintiff could not perform his past relevant work. (R. at 30.) At step five, the ALJ determined that Plaintiff could perform jobs existing in significant numbers in the national economy. (R. at 30-31.) Therefore, Plaintiff did not qualify as disabled under the Act. (R. at 31.)

## IV.   ANALYSIS

Plaintiff, forty-six years old at the time of this Report and Recommendation, previously worked as a mechanic. (R. at 88, 237.) He applied for Social Security Benefits, alleging disability from cervicalgia related to Plaintiff's two neck surgeries, anxiety and migraine headaches with an alleged onset date of April 3, 2012. (R. at 88-89.) Plaintiff's appeal to this Court alleges that the ALJ erred in affording little or limited weight to the opinions of Plaintiff's treating physicians, failing to consider Plaintiff's work history in the credibility determination and failing to incorporate all of Plaintiff's mental impairments into the RFC. (Pl.'s Mem. at 2-3.) For the reasons set forth below, the ALJ erred in her decision.

### A. Substantial Evidence Supports the ALJ's Assignment of Weight.

Plaintiff argues that the ALJ failed to provide "good/specific/supported reasons" for affording little or limited weight to the opinions of Plaintiff's treating physicians, Aaron M. Jones, M.D., Kimberly Walker, M.D., and Steven M. Fiore, M.D. (Pl.'s Mem. at 7-14.)

Defendant responds that substantial evidence supports the ALJ's decision. (Def.'s Mot. for Summ. J. and Mem. in Supp. ("Def.'s Mem.") (ECF No. 14) at 19-25.)

During the sequential analysis, when the ALJ determines whether the claimant has a medically-determinable severe impairment, or combination of impairments, that would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records that are provided and any medical evidence resulting from consultative examinations or medical expert evaluations that have been ordered. 20 C.F.R. §§ 404.1512, 404.1527. When the record contains a number of different medical opinions, including those from Plaintiff's treating sources, consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence. § 404.1527(c). If, however, the medical opinions are inconsistent internally with each other or other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved. §§ 404.1527(c)(2)-(6), (d).

Under the applicable regulations and case law, a treating source's opinion must be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. § 404.1527(c)(2); *Lewis v. Berryhill*, 858 F.3d 858, 867 (4th Cir. 2017); *Craig*, 76 F.3d at 590; SSR 96-2p.[2] Further, the regulations do not require that the ALJ accept opinions from a treating

---

[2]    Effective March 27, 2017, the SSA rescinded SSR 96-2p, and it no longer applies the "treating physician rule." 20 C.F.R. § 404.1520c (2017). Under the new rule, the SSA will consider the persuasiveness of all medical opinions and evaluate them based upon the two most important factors of supportability and consistency. §§ 404.1520c(a), (c)(1)-(2). Plaintiff filed his claim on December 10, 2012, before the regulation took effect. (R. at 219-21.) The Agency does not have the power to engage in retroactive rulemaking. *Compare Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) (requiring Congress to expressly convey the power to promulgate retroactive rules due to its disfavored place in the law), *with* 42 U.S.C. 405(a) (granting the Agency the general power to make rules, but not granting retroactive rulemaking

source in every situation, *e.g.*, when the source opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), or when the treating source's opinion is inconsistent with other evidence or when it is not otherwise well-supported. §§ 404.1527(c)(3)-(4), (d).

Courts generally should not disturb an ALJ's decision as to the weight afforded a medical opinion absent some indication that the ALJ "dredged up 'specious inconsistences.'" *Dunn v. Colvin*, 607 F. App'x 264, 267 (4th Cir. 2015) (citing *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992)). Indeed, an ALJ's decision regarding weight afforded a medical opinion should be left untouched unless the ALJ failed to give a sufficient reason for the weight afforded. *Id.*

The ALJ must consider the following when evaluating a treating source's opinion: (1) the length of the treating source relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability based upon the medical record; (4) consistency between the opinion and the medical record; (5) any specialization on the part of the treating source; and, (6) any other relevant factors. § 404.1527(c). However, those same regulations specifically vest the ALJ — not the treating source — with the authority to determine whether a claimant is disabled as that term is defined under the Act. § 404.1527(d)(1). Although the regulations explicitly apply these enumerated factors only to treating sources, those same factors may be applied in evaluating opinion evidence from "other sources." SSR 06-03p.

### 1. The Opinions of Drs. Jones, Walker and Fiore.

#### i. Dr. Jones.

Dr. Jones, physical medicine and rehabilitation physician, treated Plaintiff from 2014 through 2015. (R. at 987, 991-92, 999-1000, 1014-23, 1041-44, 1061-65, 1067.) He wrote three

---

power). Because the regulation does not have retroactive effect, SSR 96-2p applies to Plaintiff's claim.

letters, opining that Plaintiff's condition prevented him from maintaining employment for the next twelve months and beyond; and, that even if an employer could accommodate Plaintiff's restrictions, Plaintiff would miss work because of the pain resulting from increased activity. (R. at 987, 999, 1067.)

On February 20, 2015, Dr. Jones completed a physical capacities evaluation. (R. at 1014-1020.) Dr. Jones opined that Plaintiff could sit, stand and walk for one hour each during a workday. (R. at 1014.) According to Dr. Jones, Plaintiff could not use his hands for simple grasping, pushing, pulling or fine manipulation. (R. at 1014.) However, Plaintiff could operate foot controls. (R. at 1014.) Plaintiff could never lift or carry more than five pounds, occasionally lift or carry up to five pounds, and never squat, crawl, climb or reach overhead. (R. at 1015.) Plaintiff could never work around unprotected heights or moving machinery, nor could he drive automotive equipment. (R. at 1016.) Although Dr. Jones found evidence of spinal cord compression causing pain, motor loss and muscle atrophy, he noted no reflex loss, low back problems or difficulty walking. (R. at 1019-20.)

The ALJ afforded Dr. Jones' opinion little weight, because the opinion conflicted with three aspects of the record — (i) the objective findings on Plaintiff's diagnostic tests and examinations; (ii) Plaintiff's response to treatment; and, (iii) Plaintiff's daily activities, including "his ability to take care of his own personal needs, . . . drive, shop, run errands, lift a gallon of milk, lift his 18-pound nephew while standing, read, watch television and follow instructions[.]" (R. at 28.)

### ii. Dr. Walker

Dr. Walker treated Plaintiff from 2011 through 2015. (R. at 607, 616, 620, 625, 629, 631, 633, 637, 642, 650, 653, 657, 1033-38.) On February 3, 2015, Dr. Walker completed a

physical capacities evaluation and opined that Plaintiff could sit, stand or walk for less than one hour in an eight-hour workday. (R. at 1034.) Plaintiff could never lift or carry items of any weight, bend, squat, crawl, or reach above shoulder level, because of constant pain and numbness in his arms. (R. at 1035.) Dr. Walker precluded Plaintiff from exposure to unprotected heights and moving machinery, as well as driving. (R. at 1036.)

The ALJ afforded Dr. Walker's opinion little weight, because the opinion conflicted with (i) generally normal to mild findings on diagnostic tests and examinations, (ii) Plaintiff's response to treatment, (iii) Plaintiff's admissions that medication relieved his pain and (iv) Plaintiff's reported daily activities, including his ability to drive, shop, run errands, open jars, make sandwiches, hold a writing utensil and use buttons and zippers. (R. at 28.)

### iii. Dr. Fiore

Dr. Fiore treated Plaintiff from 2011 through 2013, and performed Plaintiff's second neck surgery in 2012. (R. at 323, 474, 503, 514, 894, 899.) On November 11, 2013, Dr. Fiore completed an abilities form, opining that Plaintiff could never climb, kneel or reach above the shoulder and occasionally sit, stand or walk. (R. at 912.) Plaintiff could occasionally carry up to ten pounds. (R. at 912.) On September 12, 2014, Dr. Fiore wrote a letter, explaining that he labeled Plaintiff disabled because of the severity of Plaintiff's symptoms, including spasms and cervical pain down his left arm. (R. at 998.) Dr. Fiore opined that Plaintiff could not sit, stand or walk intermittently; therefore, he could not return to work. (R. at 998.)

The ALJ afforded Dr. Fiore's opinion limited weight, because his opinion (i) conflicted with generally mild findings on diagnostic tests and generally normal findings on physical exams, including normal range of motion, sensation, coordination, strength and gait; (ii) Plaintiff's admissions that medication improved his pain; and, (iii) Plaintiff's reported activities

9

including driving, shopping, running errands, hanging out with friends and taking care of personal needs. (R. at 28.)

### 2. Plaintiff's Medical Records Support the ALJ's Decision.

The ALJ gave specific reasons for the weight that she assigned the opinions of Drs. Jones, Walker and Fiore. Substantial evidence supports the ALJ's assignment of weight. Each doctor opined that Plaintiff had limited ability to sit, stand or walk during a workday, which conflicted with Plaintiff's routinely normal or mild results on physical exams, including Plaintiff's normal gait, muscle strength and tone. Each doctor also commented that Plaintiff's constant pain further caused him extreme functional limitations, but Plaintiff had positive responses to treatment and medication, as documented throughout voluminous medical records from 2011 through 2014. Further, these three opinions do not comport with the unremarkable findings revealed on Plaintiff's MRIs, X-rays and CT scans. For the reasons discussed below, Plaintiff's medical records support the ALJ's assignment of weight to these three opinions.

Plaintiff's neck problems began when he ruptured a disc playing softball. (R. at 730, 788.) On April 4, 2011, Plaintiff presented to Stephen E. Thurston, M.D., complaining of neck pain, numbness in his left upper extremity and dizziness. (R. at 310.) After reviewing an MRI of Plaintiff's cervical spine, Dr. Thurston diagnosed Plaintiff with degenerative disc disease at C5-6 with posterior disc extrusion narrowing the spinal canal, without cord compromise, and moderate bilateral neural foraminal narrowing. (R. at 310.)

On April 5, 2011, Plaintiff's physical therapist, Laura K. Neely, D.P.T., wrote a letter regarding Plaintiff's progress with physical therapy. (R. at 544.) Dr. Neely noted that she and Plaintiff had worked to restore his cervical motion. (R. at 544.) Although Dr. Neely found nerve tension in Plaintiff's brachial plexus, she noted that Plaintiff had reported decreased pain and

improved his motion and tolerance to nerve testing. (R. at 544.) The next day, Plaintiff presented to Steven Reece, M.D. (R. at 540.) Plaintiff had jerked his right arm abruptly at work, and he complained of pain, numbness and tingling in his left arm. (R. at 540.) Dr. Reece's cervical spine exam revealed no tenderness or junction pain. (R. at 541.) Plaintiff displayed full strength and full range of motion in flexion, extension and rotation. (R. at 541.) The Spurling test[3] yielded negative results on the right cervical spine, but positive on the left. (R. at 541.) Dr. Reece's lumbar spine exam revealed no tenderness, full range of motion and full muscle strength. (R. at 541.) Plaintiff had no difficulty walking, and straight leg raise tests returned negative results. (R. at 541.)

On April 12, 2011, Plaintiff presented to Mark G. Petrizzi, M.D., with mild neck pain. (R. at 680.) Plaintiff displayed neck stiffness and myalgia. (R. at 680.) However, Dr. Petrizzi noted no decreased range of motion, joint pain, joint stiffness, joint swelling, muscle atrophy or muscle weakness. (R. at 680.) Plaintiff had normal posture and cervical spine movements. (R. at 680-81.) Examination of the cervical spine revealed no tenderness to palpation, pain, swelling or edema. (R. at 681.) Plaintiff displayed normal muscle strength and reflexes in his upper extremities. (R. at 681.)

On April 13, 2011, Plaintiff returned to Dr. Neely, who reviewed Plaintiff's care plan. (R. at 536.) Dr. Neely set goals for Plaintiff to improve his function, strength and range of motion. (R. at 536-39.) In addition to home exercise, Dr. Neely recommended rehabilitative therapy twice per week for four weeks. (R. at 539.)

---

[3]     The Spurling test detects cervical radiculopathy, and it requires the examiner to press on the top of the patient's head while the patient "rotates the head laterally and into hyperextension." *Test, Spurling*, Dorland's Illustrated Medical Dictionary (32d ed. 2012).

On May 6, 2011, Plaintiff saw Lee Blackburn, M.D., at Hanover Family Physicians for a preoperative evaluation. (R. at 677.) Plaintiff felt well with minor complaints and a good energy level. (R. at 677.) Plaintiff displayed a decreased range of motion, joint pain and stiffness, but no muscle weakness. (R. at 677-78.)

On May 18, 2011, Plaintiff underwent neck surgery at St. Mary's Hospital. (R. at 418-21.) Jed S. Vanichkachorn, M.D., performed an anterior cervical discectomy and fusion at C5-6, and reported no complications. (R. at 419-20.) Eleven days later, Plaintiff visited Dr. Blackburn for follow-up on his cholesterol. (R. at 674.) Plaintiff felt well and had no complaints. (R. at 674.) Dr. Blackburn noted Plaintiff's normal posture and gait during this and his next examination of Plaintiff on August 31, 2011. (R. at 665, 674.)

On June 18, 2011, Plaintiff presented to Brent A. Logie, M.D., reporting difficulty sleeping and anxiety. (R. at 672.) Plaintiff experienced neck stiffness and wore a collar, but he had no neck pain or myalgia. (R. at 672.) Noting that Plaintiff remained "pain free," and concerned about the addictiveness of pain medication, Dr. Logie prescribed a sleeping agent for Plaintiff. (R. at 673.) Dr. Logie's examination of Plaintiff yielded unremarkable results. The next day, Plaintiff went to the emergency room at Memorial Regional Medical Center ("Memorial Regional"). (R. at 359.) Plaintiff complained that his pain medication made him feel jittery and affected his sleep. (R. at 367.) Jonas P. Karlsson, M.D., described Plaintiff as well-developed, nourished and in no distress, with normal range of motion, muscle tone and coordination. (R. at 369.) Dr. Karlsson adjusted his medications and instructed Plaintiff to follow-up with his primary care physician, Dr. Blackburn, in two days. (R. at 365-67.)

On June 22, 2011, Plaintiff returned to Dr. Logie regarding his hypertension. (R. at 669.) Plaintiff again reported problems with his medication. (R. at 669.) Specifically, Plaintiff felt

jittery, anxious and experienced insomnia. (R. at 669.)  Plaintiff told Dr. Logie that he took

Vicodin, but threw it away when he became pain free. (R. at 669.)  Without the medication,

Plaintiff reported feeling "always on edge" and pacing. (R. at 669.)  Plaintiff further reported

that he received Valium and Clonidine in the emergency room, and he felt better. (R. at 669.)

Plaintiff wore a neck collar, and Dr. Logie noted neck stiffness. (R. at 669.)  However, Plaintiff

experienced no neck pain or myalgia. (R. at 669.)

On November 14, 2011, Plaintiff presented to Dr. Walker at Hanover Family Physicians.

(R. at 657.)  Plaintiff complained of pain in his right leg without associated weakness. (R. at

657.)  Dr. Walker noted joint pain, stiffness and myalgia. (R. at 657.)  However, a physical

examination did not reveal any unusual results. (R. at 657-58.)

On December 29, 2011, Plaintiff returned to Dr. Walker for a follow-up appointment.

(R. at 653.)  Plaintiff complained of neck pain and low back pain radiating into his right leg. (R.

at 653.)  Dr. Walker noted mild tenderness; however, straight leg raise tests returned negative

results. (R. at 654.)  Plaintiff returned, complaining of headaches, on January 30, 2012. (R. at

650.)  Plaintiff's neck bothered him, and he thought that overhead reaching at work triggered the

pain. (R. at 650.)  Dr. Walker noted trigger points in Plaintiff's neck during his physical exam,

which otherwise revealed unremarkable findings. (R. at 650-51.)

On March 1, 2012, Plaintiff reported anxiety and right shoulder pain to Dr. Walker. (R.

at 646.)  Plaintiff's physical exam showed joint pain and stiffness, but no joint instability,

locking or swelling. (R. at 646.)  On April 2, 2012, Plaintiff returned to Dr. Walker with the

same complaints. (R. at 642.)  Plaintiff showed no signs of tenderness, clicking or periarticular

muscle atrophy in his right clavicle. (R. at 643.)  Plaintiff exhibited normal strength and tone in

his right shoulder, and Dr. Walker noted no instability, sublaxation or laxity. (R. at 643.)

13

However, Plaintiff had positive results in the empty can test, Hawkins Kennedy Impingement Test and lift-off sign test on the right side. (R. at 643.)

On April 13, 2012, Plaintiff presented to Dr. Petrizzi, complaining of a headache. (R. at 639.) When examining Plaintiff's neck, Dr. Petrizzi noted no stiffness. (R. at 639.) Physical exam results remained similar to Dr. Walker's treatment notes from eleven days earlier. (R. at 640, 642-43.)

On April 18, 2012, Plaintiff presented to Michael Decker, M.D., at Advanced Orthopaedic Centers, complaining of neck pain with no radiation. (R. at 530.) Plaintiff reported that physical therapy and medication alleviated his pain. (R. at 530.) During Dr. Decker's cervical exam, Plaintiff displayed verbal and nonverbal pain behavior. (R. at 531.) Dr. Decker observed cervical tenderness, but Plaintiff had normal grip strength and circulation. (R. at 531.)

On April 21, 2012, Dr. Walker treated Plaintiff for neck pain and anxiety. (R. at 637.) Dr. Walker did not make any significant findings upon physical examination, but recommended that Plaintiff take four weeks off from work to allow his neck to heal. (R. at 638.) Dr. Walker also suggested that Plaintiff consider changing his occupation, because his work activities aggravated his neck pain. (R. at 638.)

On May 4, 2012, Plaintiff visited Hanover Family Physicians to complete paperwork to return to work. (R. at 635.) Rather than taper off, as Dr. Walker suggested, Plaintiff ceased taking his pain medication suddenly, because he had to operate heavy machinery at work. (R. at 635.) As a result, Plaintiff experienced withdrawal symptoms. (R. at 635.) Physical examination revealed unremarkable results. (R. at 636.)

Plaintiff returned to Dr. Walker on May 8, 2012, complaining that his anxiety had flared up over the weekend. (R. at 631.) Although Plaintiff showed some improvement in his neck, he

reported that he hurt it again at work while helping move a forklift. (R. at 633.) Plaintiff's physical exam showed normal breathing and no lower extremity edema. (R. at 634.) Dr. Walker noted moderate tenderness to palpitation and painful movement of the cervical spine. (R. at 634.)

On May 14, 2012, Plaintiff returned to Dr. Decker, complaining of neck pain with no radiation. (R. at 527.) Plaintiff showed improvement since his May 8 visit with Dr. Walker. (R. at 527, 634.) Plaintiff did not use an assistive walking device, and he reported that he did not experience side effects from his pain medication. (R. at 527.) Plaintiff did not report numbness or tingling. (R. at 527.) Plaintiff displayed verbal and nonverbal pain behavior, forward-leaning posture and pain in flexion and extension. (R. at 528.) However, Dr. Decker observed no cervical tenderness or spasm, and Plaintiff had normal circulation. (R. at 528.) Dr. Decker recommended that Plaintiff work on a home exercise program and did not approve Plaintiff to return to work. (R. at 528.)

On May 27, 2012, Plaintiff went to the emergency room at Memorial Regional, complaining of headaches. (R. at 377, 560.) Alexis A. Dimaio, M.D., noted Plaintiff's supple neck, but a physical examination revealed normal range of motion and normal coordination. (R. at 379, 562.) Plaintiff denied that his pain medication, Percocet, relieved his headaches. (R. at 377, 560.) Dr. Dimaio associated Plaintiff's pain with his narcotic withdrawal and dependency. (R. at 563.) After an intravenous treatment, Plaintiff reported that his pain level decreased to 2/10. (R. at 563.) Dr. Dimaio noted Plaintiff's normal range of motion, described his progress as "[i]mproved and stable," and released Plaintiff without any prescriptions. (R. at 379, 562-63.) On June 1, 2012, Plaintiff followed-up with Dr. Walker after his emergency room visit. (R. at 629.) Plaintiff's physical exam revealed unremarkable results. (R. at 630.)

Plaintiff returned to Dr. Decker on May 29, 2012. (R. at 524.) Plaintiff walked without an assistive device and stated that medication relieved his neck pain. (R. at 524.) Plaintiff displayed no pain behavior throughout the cervical exam. (R. at 525.) Dr. Decker observed no painful cervical motion, cervical tenderness or cervical spasm. (R. at 525.) Although Plaintiff displayed limited strength in his biceps and triceps, Dr. Decker's manual muscle testing of Plaintiff's upper extremities yielded normal results. (R. at 525.) Plaintiff also had normal grip strength. (R. at 525.)

On June 7, 2012, Plaintiff presented to Marie F. Gerardo, N.P., complaining of migraines. (R. at 311-14.) Nurse Gerardo noted that Plaintiff had neck pain daily. (R. at 311.) Plaintiff appeared well-developed, well-nourished and in no apparent distress. (R. at 312.) He demonstrated normal strength with normal tone and bulk with slight tremulousness in the bilateral extended upper extremities. (R. at 313.) Plaintiff walked with a normal gait and good arm swing, and he had symmetrical reflexes, except for clonus at the right ankle, left toe down and right toe up. (R. at 313.)

On June 12, 2012, Plaintiff presented to Dr. Decker, complaining of neck pain with no radiation. (R. at 517.) Dr. Decker observed that Plaintiff walked without an assistive device. (R. at 517.) Plaintiff displayed no pain behavior throughout Dr. Decker's physical examination. (R. at 517.) Plaintiff walked with a normal gait and had normal posture and circulation. (R. at 518.) Dr. Decker noted no painful cervical motion, cervical tenderness or cervical spasm. (R. at 518.) Dr. Decker recommended surgery, and referred Plaintiff to Dr. Fiore. (R. at 514, 518.)

Accordingly, Plaintiff visited Dr. Fiore on June 14, 2012. (R. at 514.) Plaintiff reported constant neck pain and a pain level of 4/10. (R. at 514.) He walked without assistance. (R. at 514.) Although Dr. Fiore noted a decreased range of motion in some of Plaintiff's upper

16

extremities, Plaintiff demonstrated 5/5 grip strength and experienced normal sensations.  (R. at 515.)  Dr. Fiore and Plaintiff discussed and scheduled a posterior C5-6 fusion surgery.  (R. at 516.)  Plaintiff underwent his second neck surgery at St. Francis Medical Center ("St. Francis") on July 3, 2012.  (R. at 323, 503.)  Dr. Fiore performed a posterior C5-6 fusion with lateral mass screws and rods.  (R. at 332, 503.)  Post-surgery, Dr. Fiore noted that Plaintiff "was up, ambulating with physical therapy in a firm collar[.]"  (R. at 332.)  St. Francis discharged Plaintiff two days later.  (R. at 332, 504.)

The next day, on July 6, 2012, Plaintiff went to the emergency room at Memorial Regional, complaining of a fever.  (R. at 388, 571.)  Plaintiff had a normal temperature.  (R. at 390.)  During his physical exam, Plaintiff displayed a normal range of motion, no rebound or guarding and no tenderness, although David F. Martin, M.D., noted Plaintiff's supple neck.  (R. at 390, 573.)  On July 10, 2012, Plaintiff returned to Dr. Walker after his emergency room visit.  (R. at 625.)  Dr. Walker's physical examination yielded normal results.  (R. at 626.)

On July 15, 2012, Plaintiff visited Dr. Petrizzi.  (R. at 623.)  Plaintiff complained of nausea, which Dr. Petrizzi traced to Plaintiff's Dilaudid prescription.  (R. at 623.)  Plaintiff wore a cervical collar, but Dr. Petrizzi did not make any unusual findings during Plaintiff's physical examination.  (R. at 624.)

Two days later, on July 17, 2012, Plaintiff returned to the emergency room at Memorial Regional.  (R. at 581-84.)  He presented to April N. O'Bier, M.D., with a rash caused by an allergic reaction.  (R. at 581.)  Plaintiff appeared well and in no distress.  (R. at 393, 583.)  Plaintiff's physical exam revealed no joint tenderness, deformity or swelling.  (R. at 393, 583.)  Plaintiff had a normal range of motion.  (R. at 393, 583.)

On July 27, 2012, Plaintiff returned to Dr. Walker seeking generic medications, because his insurance coverage would soon end. (R. at 620.)  Plaintiff's physical exam showed unremarkable findings. (R. at 621.)  Plaintiff walked with a normal gait, displayed normal posture and appeared well-nourished and developed. (R. at 621.)

On October 25, 2012, Plaintiff presented to Gregory J. Auber, N.P., for treatment of his neck pain. (R. at 479.)  Plaintiff's pain level ranged between 4/10 and 7/10. (R. at 479.)  Although Plaintiff reported aggravation by flexion, lifting, bending and twisting, he stated that medication alleviated his neck and arm pain. (R. at 479.)  Specifically, Plaintiff stated that "what does work is the Oxycodone . . . that Dr. Decker . . . prescribed[.]" (R. at 479.)

On November 14, 2012, Plaintiff returned to Dr. Fiore with cervical pain. (R. at 474.)  Plaintiff reported that twisting, flexing and looking up increased his pain. (R. at 474.)  However, heat and medication relieved the pain. (R. at 474.)  Dr. Fiore noted that Plaintiff displayed no pain behavior throughout the cervical exam. (R. at 475.)  Plaintiff walked with a normal gait. (R. at 475.)  A review of Plaintiff's CT scan of the cervical spine showed no complications or nerve compression. (R. at 475.)  Dr. Fiore noted "[t]his all appears to be solidly fused" and described Plaintiff's recent fusion as "successful." (R. at 475.)  However, because of Plaintiff's neck, shoulder and arm symptoms, Dr. Fiore opined that Plaintiff could not work, and he recommended that Plaintiff apply for disability. (R. at 475.)  Dr. Fiore further instructed Plaintiff on proper lifting/bending, posture, therapeutic exercise and activity modification. (R. at 475.)

On November 20, 2012, Plaintiff returned to Nurse Auber at Advanced Orthopaedic Centers for his neck pain. (R. at 471.)  Plaintiff reported constant pain at a 3/10 level. (R. at 471.)  Nurse Auber continued Plaintiff's Oxycodone prescription, and Plaintiff signed a medication agreement that he would return every four weeks for refills. (R. at 472.)

On December 5, 2012, Plaintiff presented to Dr. Walker, complaining of neck pain, a rash, headaches, stomach pain and fatigue. (R. at 616.) Plaintiff walked with a normal gait and his physical exam produced unremarkable results, other than the rash. (R. at 617.)

On December 13, 2012, Plaintiff's mother called the office of Advanced Orthopaedic Centers, reporting that Plaintiff had run out of his medication. (R. at 467.) Plaintiff's mother requested that Dr. Decker prescribe more medication to Plaintiff. (R. at 467.) Dr. Decker refused, because Plaintiff failed to comply with his medication agreement. (R. at 467.) Plaintiff's mother canceled Plaintiff's follow-up appointment with Dr. Decker, and informed the office that Plaintiff would "get something elsewhere." (R. at 467.) Accordingly, that same day, Plaintiff went back to the emergency room at Memorial Regional, complaining of withdrawal from his pain medication. (R. at 402, 590.) Plaintiff's physical examination showed normal range of motion, supple neck, no edema and no tenderness. (R. at 405, 592.)

On December 17, 2012, Plaintiff presented to Dr. Walker for a follow-up appointment regarding Plaintiff's medication, rash and withdrawal symptoms. (R. at 614.) Dr. Walker noted Plaintiff's fatigue, but his physical examination showed unremarkable findings. (R. at 614-15.)

On December 24, 2012, Plaintiff presented to Charlotte B. Woodfin, M.D., at Hanover Family Physicians. (R. at 612.) Dr. Woodfin noted that Lyrica had helped Plaintiff's pain, and Plaintiff appeared in no acute distress. (R. at 612-13.) Plaintiff's physical exam yielded unremarkable results, including normal breathing and no lower extremity edema. (R. at 613.)

In sum, Plaintiff's medical records from 2011 and 2012 support the ALJ's decision to afford little or limited weight to the work-preclusive opinions of Drs. Jones, Walker and Fiore. (R. at 27-28.) Following his neck surgery, Plaintiff showed improvement in physical therapy. (R. at 544.) During physical examinations, Plaintiff's doctors noted some or all of the following:

19

normal posture; normal range of motion; normal muscle strength and tone; normal gait; normal circulation; lack of tenderness; and, other unremarkable results.  (R. at 313, 369, 379, 390, 405, 475, 518, 525, 528, 531, 613, 617, 621, 624, 626, 636, 638, 640, 647, 650-51, 674, 681.)  As the ALJ noted, Plaintiff reported pain relief from medication.  (R. at 474, 479, 530, 612, 669.)

On January 8, 2013, Plaintiff returned to Dr. Walker for a blood pressure check.  (R. at 607.)  Dr. Walker noted that Plaintiff completely weaned himself off of other pain medications and "fel[t] much better on . . . [L]yrica" which another doctor had prescribed to him.  (R. at 607.)  Plaintiff still experienced neck pain and stiffness.  (R. at 607.)

On February 6, 2013, Plaintiff presented to Mohamad El-Masri, M.D., at Memorial Regional, needing to change his primary care physician due to a change of insurance.  (R. at 730, 732.)  Dr. El-Masri described Plaintiff's neck as supple with no significant adenopathy.  (R. at 733.)  Plaintiff had no issue moving all of his extremities.  (R. at 733.)  Plaintiff returned to Dr. El-Masri one week later, requesting pain medication after "he was weaned off all his narcotics in the past."  (R. at 749.)  Dr. El-Masri noted no acute swelling in Plaintiff's neck.  (R. at 751.)  Dr. El-Masri prescribed Aleve for Plaintiff's neck pain.  (R. at 751.)

On February 15, 2013, Plaintiff presented to Waqas Sohail, M.D., at Bon Secours Health System ("Bon Secours"), complaining of headaches.  (R. at 851.)  Dr. Sohail noted tenderness in Plaintiff's neck and found that touching the neck triggered Plaintiff's headaches.  (R. at 851.)  Plaintiff reported benefiting from Topamax and "felt significantly better being on Lyrica."  (R. at 851, 856.)  Dr. Sohail noted that Plaintiff did not experience myalgias, athralgias, stiff joints or neck pain.  (R. at 852.)  Plaintiff demonstrated 5/5 strength, preserved muscle bulk and tone, and walked with a normal gait.  (R. at 854.)

On February 27, 2013, Plaintiff returned to Dr. El-Masri for a follow-up appointment. (R. at 758.) After visiting a neurologist, Plaintiff reported feeling "wonderful" and "that [his] pain [was] much better." (R. at 758.) Plaintiff's physical exam revealed unremarkable results. (R. at 760.) Dr. El-Masri continued Plaintiff's Lyrica prescription for his chronic neck pain. (R. at 760.) Plaintiff returned one month later, having lost weight after improving his diet. (R. at 770.) He reported trying to eat healthy to improve his cholesterol. (R. at 770.) Plaintiff felt tingling in his first three fingers bilaterally. (R. at 770.) Otherwise, Plaintiff felt fine and had no complaints. (R. at 770.) Plaintiff's physical exam showed unremarkable results. (R. at 772.)

On April 18, 2013, Plaintiff presented to Dr. Fiore, complaining of cervical pain. (R. at 899.) Plaintiff reported numbness and tingling in his fingers bilaterally and described his pain as an 8/10. (R. at 899.) However, during the cervical exam, Plaintiff displayed no pain behavior, cervical spasm or painful cervical motion, and he walked with a normal gait. (R. at 900.) Plaintiff experienced mild dysesthesia in his upper extremities. (R. at 901.)

That same day, Plaintiff returned to Dr. Sohail regarding his migraines. (R. at 865.) Plaintiff reported improved symptoms from taking Topamax and Lyrica. (R. at 865.) Plaintiff displayed 5/5 muscle strength throughout his extremities. (R. at 866.) Dr. Sohail noted that Plaintiff preserved muscle bulk and tone, and had intact sensations. (R. at 866.) Further, Plaintiff perceived vibrations normally, and Dr. Sohail did not observe any abnormal spinal level. (R. at 866.) Dr. Sohail could not recommend injections for the pain due to insurance coverage issues, but he suggested that Plaintiff continue Topamax and Lyrica. (R. at 866.)

On May 24, 2013, Plaintiff presented to Carl B. Weiss, M.D., complaining of neck pain with bilateral numbness and tingling. (R. at 788.) Plaintiff had no difficulty walking and experienced no stiffness, swelling or joint pain. (R. at 788.) Dr. Weiss noted that Plaintiff's

21

physical exam revealed good thenar intrinsic strength and negative Tinel's sign.  (R. at 789.)

Plaintiff demonstrated 4/5 muscle strength on the left wrist, but otherwise 5/5 muscle strength

throughout the upper extremities.  (R. at 789.)  Full neck rotation proved painful for Plaintiff, and

Dr. Weiss noted a decreased reflex in the right bicep.  (R. at 789.)

On May 31, 2013, Dr. Alan Padgett V, M.D., reviewed Plaintiff's MRI of the cervical

spine.  (R. at 794-95.)  Dr. Padgett found C5-6 anterior and posterior decompression and fusion.

(R. at 795.)  While Dr. Padgett found no residual stenosis, he observed slight displacement at C5

with no cord signal abnormality, but noted that this "[was] likely incidental."  (R. at 795.)

On July 18, 2013, Plaintiff went to the emergency room at Regional Memorial, where he

complained of neck pain and headaches.  (R. at 797.)  He rated his pain level at 9/10.  (R. at

797.)  Dr. O'Bier noted that Plaintiff appeared well and in no distress, but he displayed drug-

seeking behavior.  (R. at 799.)  Despite Plaintiff's reported neck pain, his physical exam showed

no joint tenderness, deformity or swelling.  (R. at 799.)  Plaintiff demonstrated a normal range of

motion.  (R. at 799.)   Staff also took an MRI of Plaintiff's cervical spine.  (R. at 810-11.)  The

next day, Austin E. Peat, M.D., reviewed the MRI results, compared them to the results from

May 2013, and found no significant changes.  (R. at 811.)  Dr. Peat noted that Plaintiff's spinal

cord tilted slightly near the surgical site.  (R. at 811.)

On October 24, 2013, Plaintiff returned to Dr. Sohail at Bon Secours.  (R. at 879.)

Plaintiff complained of migraine headaches and chronic neck pain.  (R. at 879.)  Dr. Sohail noted

that Plaintiff's May 2013 MRI looked "essentially normal, except finding of mild posterior

leftward deviation of spinal cord at C5," and that the latest MRI showed nothing new.  (R. at

879.)  Plaintiff reported that Lyrica had helped in the past, but he did not feel that the medication

currently improved his pain.  (R. at 879.)  Dr. Sohail noted Plaintiff's normal bulk, tone and

strength in all four extremities. (R. at 880.) Plaintiff had normal reflexes in the upper extremities and a normal gait. (R. at 880.)

Plaintiff presented to Dr. Fiore on October 31, 2013, complaining of cervical pain and low back pain radiating to his legs and feet with numbness and tingling. (R. at 894.) Plaintiff rated his pain level as 8/10. (R. at 894.) During the cervical and lumber exams, Plaintiff showed no pain behavior and he walked with a normal gait. (R. at 895-96.) Plaintiff experienced pain during straight leg raise tests, as well as some reduced reflexes and decreased sensation. (R. at 896.) Dr. Fiore noted that Plaintiff had a slight retrolisthesis on L5-S1 in his lower back, but Plaintiff's X-rays otherwise looked normal. (R. at 896.) Dr. Fiore recommended steroids and physical therapy. (R. at 896.)

On November 6, 2013, Plaintiff presented to Monte T. Hill, M.D., of Bon Secours for medical evaluation. (R. at 937-39.) Dr. Hill described Plaintiff as well-nourished and in no distress. (R. at 938.) Dr. Hill adjusted Plaintiff's medications. (R. at 939.) On December 19, 2013, Plaintiff returned to Dr. Hill for further medication evaluation. (R. at 950, 952.) Plaintiff reported that Tramadol did not relieve his pain. (R. at 950.) Dr. Hill noted that Plaintiff appeared well-nourished and not distressed. (R. at 952.) He prescribed Hydrocodone for Plaintiff's pain. (R. at 952.)

On February 17, 2014, Plaintiff presented to Shailendra Kapoor, M.D., complaining of neck and arm pain. (R. at 965.) Plaintiff reported that Tramadol controlled some of his pain, but his primary care physician would prescribe Vicodin for exacerbated pain. (R. at 966.) Dr. Kapoor noted Plaintiff's supple neck, but found no midline tenderness. (R. at 968.) Plaintiff displayed slight tenderness in the lower paraspinal cervical area, but intact sensation bilaterally.

(R. at 968.)  Plaintiff demonstrated normal elbow reflexes and 5/5 bilateral power.  (R. at 968.)

Dr. Kapoor prescribed a small amount of Vicodin for Plaintiff's pain.  (R. at 966, 969.)

On April 2, 2014, Plaintiff presented to Matthew T. Mayr, M.D., to treat his neck and left

arm pain.  (R. at 988-90.)  Plaintiff reported that he always felt the pain, and it sometimes moved

to the right arm.  (R. at 988.)  Plaintiff rated his pain level as 10/10 at all times — a level that

Plaintiff had never expressed to his other treatment providers.  (R. at 988.)  Physical examination

revealed that Plaintiff experienced joint pain and stiffness along with muscle pain and weakness,

but no back pain, joint swelling or muscle cramps.  (R. at 990.)  Dr. Mayr reviewed Plaintiff's

treatment history, as well as Plaintiff's MRIs from May 2013 and July 2013.  (R. at 990.)  Dr.

Mayr observed some tilting of the spinal cord at C5-6 in Plaintiff's MRIs.  (R. at 990.)  Dr. Mayr

also noted "good placement of the hardware" in Plaintiff's neck.  (R. at 990.)  Finally, Dr. Mayr

opined that Plaintiff did not need additional surgery, because he saw no further compression of

the spinal cord or clinical signs of ulnar neuropathy.  (R. at 990.)

Plaintiff requested that Dr. Mayr write him a letter in support of his disability.  (R. at

990.)  Dr. Mayr responded that such information "should probably come from [Plaintiff's]

surgeon."  (R. at 990.)  Plaintiff also inquired about pain medication, but Dr. Mayr did not

provide long-term pain management.  (R. at 990.)

Plaintiff presented to Dr. Jones at Sheltering Arms Physical Rehabilitation Centers

("Sheltering Arms") on April 10, 2014.  (R. at 987.)  Following his evaluation of Plaintiff, Dr.

Jones wrote a letter stating that, in his medical opinion, Plaintiff suffered from "the late effects of

cervical stenosis with myelopathy" after two neck surgeries.  (R. at 987.)  Again, Dr. Jones noted

the slight tilting of Plaintiff's spinal cord, but he attached no significance to it.  (R. at 987.)  Dr.

Jones recommended physical therapy with a goal of controlling Plaintiff's pain.  (R. at 987.)

24

On June 6, 2014, Plaintiff returned to Sheltering Arms for a follow-up visit with Dr. Jones. (R. at 991.) Plaintiff complained of chronic neck and arm pain. (R. at 991.) Plaintiff had attended three sessions of physical therapy, but that only worsened his pain. (R. at 991.) Hydrocodone did not improve Plaintiff's pain, though Diazepam proved somewhat effective. (R. at 991.) Physical examination revealed tenderness over the cervical paraspinal muscles and positive Spurling test results on the right side. (R. at 991.) However, Dr. Jones noted that Plaintiff generally appeared in no acute distress. (R. at 991.) Dr. Jones instructed Plaintiff to see his primary care physician, Dr. Hill, for medication. (R. at 992.)

Plaintiff returned to Sheltering Arms on August 6, 2014, with the same complaints. (R. at 991, 1000.) Moving his shoulders through a full range of motion caused Plaintiff severe pain. (R. at 1000.) Dr. Jones noted reduced range of motion of the cervical spine, weak grip strength on the left and pain past fifteen degrees in any direction. (R. at 1000.) However, Plaintiff appeared in no acute distress and walked with a normal gait. (R. at 1000.) Dr. Jones noted that Plaintiff took Hydrocodone twice per day. (R. at 1000.) Plaintiff stopped taking Baclofen on his own, because it made him jittery. (R. at 1000.) Plaintiff experienced some improvement in his condition when he drove or slept with a soft neck brace. (R. at 1000.)

On October 16, 2014, Plaintiff took a physical performance test at Sheltering Arms with physical therapist Lynn Hewette, P.T. (R. at 1055, 1058.) Plaintiff reported that he could sit for ten minutes, walk for fifteen minutes and he did not need help with self-care. (R. at 1055.) Plaintiff experienced ongoing neck pain, as well as variable arm pain and numbness, worse on the left side. (R. at 1055.) Ms. Hewette observed that Plaintiff had slightly forward standing posture. (R. at 1056.) Plaintiff could raise his hands halfway above his head, place his hands behind his head and reach to the opposite shoulder. (R. at 1056.) Plaintiff could also fully squat

and reach down to touch his ankles. (R. at 1056.) Further, Plaintiff could transition from sitting to standing, and from squatting to standing, with minimal use of his hands. (R. at 1056.) Plaintiff could not balance on his left leg, but could shakily balance on his right for ten seconds. (R. at 1056.) Ms. Hewette described Plaintiff's grip as variable and guarded. (R. at 1056.)

Next, Ms. Hewette observed that Plaintiff's toes turned in when he walked and that he took short steps. (R. at 1057.) However, Plaintiff walked without an assistive device. (R. at 1057.) Plaintiff sat with poor posture and reported discomfort when cued to correct it. (R. at 1057.) Plaintiff successfully completed a ten-minute treadmill walk test; climbed one flight of stairs normally (using the railing); and, stood on his feet for approximately forty minutes. (R. at 1057.) Plaintiff only took one unscheduled break. (R. at 1057.)

Overall, Ms. Hewette stated that Plaintiff successfully completed the physical performance test and noted that he "generally demonstrated baseline strength and function levels consistent with" sedentary work. (R. at 1058.) Plaintiff reported that his pain did not increase significantly post-test. (R. at 1056.) During observation, Plaintiff presented as "intermittently guarded." (R. at 1058.) Notably, Plaintiff moved "much more freely" outside of the test tasks, particularly in his cervical motions. (R. at 1058.) Ms. Hewette found that Plaintiff generally self-limited his abilities due to pain or fear of pain. (R. at 1058.)

On November 24, 2014, Plaintiff returned to Dr. Jones to follow-up about his neck and arm pain. (R. at 1022, 1041.) Dr. Jones noted that Plaintiff saw a local neurologist, who started him on Elavil at nighttime, but Plaintiff claimed that this did not provide significant pain relief. (R. at 1022, 1041.) Plaintiff presented wearing a soft neck collar, because he had injured his neck the day before. (R. at 1022, 1041.) However, Plaintiff did not seek immediate help for this injury. (R. at 1022, 1041.) Plaintiff reported that his recent physical performance test results

showed that he could perform sedentary to light work. (R. at 1022, 1041.) But Plaintiff complained that his pain and numbness increased after the evaluation, "especially . . . later that evening." (R. at 1022, 1041.) In contrast, Ms. Hewette's report reflected "*no* significant increase in pain" post-physical performance test. (R. at 1056 (emphasis added).) Dr. Jones' examination revealed some tenderness in the right cervical paraspinal muscles. (R. at 1023, 1042.) Dr. Jones noted that Plaintiff had a restricted range of motion, but the upper extremities remained within normal limits. (R. at 1023, 1042.) Dr. Jones discontinued Plaintiff's Hydrocodone and Oxycodone — which had not improved Plaintiff's pain — and prescribed Dilaudid, from which he benefited in the past. (R. at 1023, 1042.)

Again, Plaintiff's medical records from 2013 and 2014 reflect the mild and unremarkable findings that the ALJ noted in her reasoning for affording the opinions of Drs. Jones, Walker and Fiore limited little weight. Plaintiff's physical exams revealed the following findings: lack of pain or pain behavior; lack of cervical spasms; normal muscle strength or tone; normal gait; normal reflexes; and, unremarkable findings. (R. at 788, 799, 852, 866, 880, 895, 900-01, 968, 990, 1000.) Plaintiff also reported that medication improved or alleviated his pain. (R. at 758, 851, 856, 865, 879, 966, 1000, 1023, 1042.) Treatment records consistently showed 5/5 grip and muscle strength throughout Plaintiff's extremities. (R. at 789, 854, 866, 968.) These records directly contradict Dr. Jones' and Dr. Walker's opinions that Plaintiff could not perform any repetitive actions with his hands. (R. at 1014, 1034.)

Objective medical evidence from 2015 shows further inconsistencies between the doctors' opinions and the record. On February 20, 2015, Plaintiff presented to Dr. Jones, reporting aches and pains in his right elbow, right knee and left shoulder. (R. at 1039, 1063.) Plaintiff also complained of neck pain, migraines and numbness in both hands. (R. at 1039,

1063.) Dr. Jones stated that Plaintiff's X-rays showed "stable hardware," and another doctor had

not recommended any additional surgery. (R. at 1039, 1063.) Physical examination revealed

tenderness in Plaintiff's cervical parspinal muscles and abnormal sensation to light touch in both

hands, but Plaintiff appeared in no acute distress. (R. at 1039-40, 1063-64.) Dr. Jones increased

Plaintiff's Dilaudid dosage and referred him to Maged Hamza, M.D. at Virginia Commonwealth

University ("VCU") Spine Center for injection therapy options. (R. at 1040, 1064.)

On April 15, 2015, Plaintiff returned to Dr. Jones. (R. at 1061.) Plaintiff reported a

10/10 pain level — severe and constant. (R. at 1061.) But Plaintiff again reported that

medication eased his pain. (R. at 1061.) Specifically, Plaintiff took Dilaudid four times per day,

reducing the pain to 5/10 for three to four hours. (R. at 1061.) Dr. Jones noted that Plaintiff

appeared moderately distressed from pain, but otherwise pleasant. (R. at 1061.) Plaintiff did not

have any shoulder impingement bilaterally, nor did he exhibit any pain with Adson's test. (R. at

1061.) Dr. Jones noted tenderness in the paraspinal muscles of the cervical spine. (R. at 1061.)

Dr. Jones reviewed Plaintiff's January 2014 MRI, noting subtle irregularity of the spinal cord,

and he increased Plaintiff's dosage of Dilaudid to treat pain flare-ups. (R. at 1062.)

Though limited, Plaintiff's latest treatment records from 2015 further bolster the ALJ's

opinion and highlight the inconsistency between Dr. Jones' opinion and the majority of

Plaintiff's medical records. In sum, Plaintiff's physical exams routinely yielded normal or mild

findings, (R. at 313, 369, 379, 390, 405, 475, 518, 525, 528, 531, 613, 617, 621, 624, 626, 636,

638, 640, 646, 650-51, 674, 681, 788, 799, 852, 866, 880, 895, 900-01, 968, 990, 1000), and

medication often reduced his pain. (R. at 474, 479, 530, 607, 612, 669, 758, 851, 856, 865, 879,

966, 1023, 1042, 1061.) Readings of Plaintiff's X-rays, MRIs and CT scans also revealed mostly

normal findings, aside from a slightly tilted spinal cord to which clinicians did not attribute much

significance.  (R. at 795, 811, 879, 896.)  Thus, substantial evidence supports the ALJ's decision
to afford little weight to the opinions of Drs. Jones, Walker and Fiore.

### 3. Plaintiff's Testimony and Reported Activities of Daily Living Support the ALJ's Decision.

In addition to inconsistencies with the medical records, the ALJ discounted the opinions
of Drs. Jones, Walker and Fiore, because they did not comport with Plaintiff's reported activities.
(R. at 27-28.)  Specifically, the ALJ found those opinions inconsistent with Plaintiff's ability to
drive, shop, run errands, lift a gallon of milk, pick up his 18-pound nephew, read, watch
television, use buttons and zippers, and hang out with friends.  (R. at 27-28.)  Substantial
evidence supports the ALJ's decision.

During the hearing, Plaintiff testified that his neck and arms ached, his hands shook and
he experienced numbness in his left foot.  (R. at 50-52.)  Plaintiff also complained of headaches
and reported that although medication did not completely eradicate his pain, it "[took] the edge
off."  (R. at 54.)  Plaintiff further reported that Lyrica "somewhat" helped the numbness in his
hands, and hot water helped the numbness in his foot.  (R. at 60.)  Plaintiff testified that he felt
sharp pain when reaching.  (R. at 61.)  He watched television sitting up and laying down,
sometimes went out to lunch with his mother and cooked himself meals in the microwave.  (R. at
62-65.)  Although he experienced pain, Plaintiff dressed himself and he could lift his 18-pound
nephew while standing.  (R. at 52, 57, 65, 71-72.)  When questioned about his hand use, Plaintiff
stated he could hold a pen or pencil to write, open jars, button shirts and use zippers.  (R. at 68-
69.)  These admitted activities cut against the doctors' extreme opinions that precluded Plaintiff
from using his hands.

In a function report completed on February 5, 2013, Plaintiff stated that he did not need
reminders to take care of his personal needs and grooming.  (R. at 251, 256.)  Unless he

experienced too much pain or numbness in his hands, Plaintiff could drive. (R. at 252.) Plaintiff could also ride in a car and grocery shop a few times per week for about half an hour. (R. at 252.) Plaintiff's social activities included hanging out and watching his nieces and nephews play. (R. at 253.) Plaintiff could walk for ten minutes before needing to stop and rest. (R. at 254.) In a third-party function report, Plaintiff's mother also reported that Plaintiff enjoyed reading and watching television, and that he sometimes talked on the phone with friends or visited with family. (R. at 264-65.) Plaintiff's mother reported that Plaintiff could walk between fifteen and twenty minutes before needing to rest. (R. at 266.) Accordingly, Plaintiff's function report and testimony support the ALJ's findings that medication improved his pain and that Plaintiff retained greater abilities than those opined by Drs. Jones, Walker and Fiore.

### 4. The State Agency Consultants' Opinions Support the ALJ's Decision.

Additionally, the opinions of state agency consultants Robert Keely, M.D., and Carolina Bacani-Longa, M.D., support the ALJ's decision to afford little or limited weight to the treating physicians' opinions. State agency medical consultants are highly qualified physicians who are experts in Social Security disability evaluation. 20 C.F.R. § 404.1513a(b)(1). Therefore, when considering the opinion of a state agency medical consultant, the ALJ must evaluate those findings just as she would for any other medical opinion. § 404.1513a(b)(1).

On February 25, 2013, Dr. Keely reviewed Plaintiff's medical records and found Plaintiff capable of light work with frequent climbing of ramps/stairs, balancing, kneeling, stooping, crouching and crawling, and certain exertional limitations, including limited lateral and overhead reaching. (R. at 94-95.) On December 17, 2013, Dr. Bacani-Longa reviewed Plaintiff's medical records on reconsideration and likewise found Plaintiff capable of light work with the same

30

exertional limitations. (R. at 112-14.) Dr. Longa also limited Plaintiff to occasional reaching due to his cervical spine fusion. (R. at 114.)

Accordingly, the opinions of Drs. Keely and Bacani-Longa further support the ALJ's decision to afford little weight to the opinions of Drs. Jones, Walker and Fiore.[4] The state agency consultants considered Plaintiff's medical records from 2011 through 2013 and, like the ALJ, found Plaintiff capable of work involving frequent fingering and handling. (R. at 24, 95, 113.) Plaintiff's treating physicians imposed extreme limitations on Plaintiff (e.g., pain prevented him from performing even sedentary work (Dr. Jones); Plaintiff could sit, stand or walk for less than one hour in a workday (Dr. Walker)). (R. at 28, 1034, 1067.) In contrast, the state agency medical consultants imposed limitations, such as limited overhead reaching, that correspond to Plaintiff's documented pain and otherwise normal or mild physical exam results.

In sum, objective medical evidence, Plaintiff's own statements and the opinions of the state agency medical consultants support the ALJ's assignment of weight to the opinions of Drs. Jones, Walker and Fiore. Accordingly, the ALJ did not err in weighing the medical opinions.

### B. The ALJ Did Not Err by Failing to Mention Plaintiff's Work History in the Credibility Determination.

Plaintiff argues that the ALJ erred by failing to discuss Plaintiff's work history when assessing his credibility. (Pl.'s Mem. at 18-21.) Specifically, Plaintiff argues that the ALJ should have considered Plaintiff's twenty-three years of experience and consistent earnings.

---

[4]      Here, Plaintiff notes that the ALJ afforded the state agency consultants' opinions some weight, even though neither Dr. Keely nor Dr. Longa had the benefit of reviewing Plaintiff's complete medical history. (Pl.'s Mem. at 13.) However, the ALJ afforded those opinions only some weight for that very reason. (R. at 29 ("The undersigned gives [the opinions of the state agency medical consultants] some weight, but not substantial weight, because those consultants did not have the opportunity to consider additional evidence submitted at the hearing level[.]").) Ultimately, the ALJ crafted a more restrictive RFC than the state agency consultants, limiting Plaintiff to less than a full range of sedentary work. (R. at 24.)

(Pl.'s Mem. at 19.)  Defendant responds that the ALJ did not err, because work history is not a dispositive factor in the credibility determination.  (Def.'s Mem. at 28-29.)

The ALJ must evaluate a claimant's RFC after step three of the sequential analysis, but before deciding whether a claimant can perform past relevant work at step four.  20 C.F.R. §§ 404.1520(e)-(f), 404.1545(a)(1).  In determining Plaintiff's RFC, the ALJ must consider all presented evidence when evaluating a claimant's symptoms, including "information about [the claimant's] past work record."  § 404.1529(c)(3).  In addition to considering past work, the ALJ considers a variety of other information including statements about the claimant's symptoms, evidence submitted by the claimant's medical sources and evidence submitted by SSA employees and others.  § 404.1529(c)(3).  The ALJ's evaluation must take into account "all the available evidence," including a credibility finding of the claimant's statements regarding the extent of the symptoms and must provide specific reasons for the weight given to the individual's statements.  *Craig*, 76 F.3d at 595-96; SSR 96-7p, at 5-6, 11.[5]

Various district courts have acknowledged that the ALJ should take work history into account and that a robust work history strengthens a claimant's credibility.  *See, e.g., Bladley v. Colvin*, 2016 WL 5928811, at *14 (N.D. Ill. Oct. 11, 2016) ("[A] claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability.") (citing *Hill v. Colvin*, 807 F.3d 862, 868 (7th Cir. 2015)).  Further, district courts have noted that an attempt to return to work enforces a claimant's credibility.  *See, e.g., Moncus v. Colvin*, 2013 WL 4854518, at *3 (E.D.N.C. Sept. 11, 2013) ("[P]laintiff's attempts to return to

---

[5]      On March 16, 2016, the Agency issued SSR 16-3p, which rescinded and superseded SSR 96-7p, eliminating the credibility finding at issue here.  Plaintiff filed his claim on December 10, 2012, before SSR 16-3p took effect.  (R. at 219-21.)  As previously, stated the Agency does not have the power to engage in retroactive rulemaking.  Thus, the Court will review the ALJ's decision under SSR 96-7p.

work . . . support his credibility."). However, while work history remains relevant to a credibility determination, it is but one of many factors in consideration and not controlling. *Maner v. Colvin*, 2014 WL 4656383, at *5 (D.S.C. Sept. 17, 2014).

Courts in the Fourth Circuit have confirmed that "the ALJ's mere failure to mention [a claimant's] work history explicitly does not warrant remand or reversal in the face of [the] otherwise supported findings." *Terrell v. Colvin*, 2015 WL 966256, at *13 (E.D. Va. Mar. 4, 2015); *see also Pope v. Colvin*, 2016 WL 1211807, at *12 (W.D. Va. Mar. 8, 2016), *R. & R. adopted*, 2016 WL 1226972 (W.D. Va. Mar. 28, 2016) ("[E]ven though the ALJ did not explicitly address the correlation between [the claimant's] work history and her credibility, the ALJ was well aware of her work history, as he developed the evidence of such . . . during the hearing."); *Cooper v. Astrue,* 2011 WL 6742500, at *7 (E.D. Va. Nov. 8, 2011), *R. & R. adopted,* 2011 WL 6749018 (E.D. Va. Dec. 22, 2011) (finding that work history alone does not contravene an ALJ's credibility finding where substantial objective medical evidence in the record does not support a plaintiff's subjective complaints). Thus, when the ALJ appropriately considers all relevant factors, hears the claimant's testimony and observes his demeanor, the ALJ's credibility determination deserves deference. *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

This Court must give great deference to the ALJ's credibility determinations. *Eldeco, Inc. v. N.L.R.B.*, 132 F.3d 1007, 1011 (4th Cir. 1997). The Fourth Circuit has determined that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" *Id.* (quoting *N.L.R.B. v. Air Prods. & Chems., Inc.*, 717 F.2d 141, 145 (4th Cir. 1983)). Therefore, this Court must accept the ALJ's factual findings and credibility determinations unless "'a credibility determination is

unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.'" *Eldeco, Inc.*, 132 F.3d at 1011 (quoting *N.L.R.B. v. McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir. 1993)).

Here, the ALJ found Plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms "not entirely credible." (R. at 25.) The ALJ considered Plaintiff's work history. First, during the hearing, the ALJ inquired about Plaintiff's past employment. (R. at 49-50.) The ALJ asked Plaintiff questions about the requirements of his previous work as a maintenance mechanic helper. (R. at 49-50.) The ALJ asked Plaintiff whether his previous job required heavy lifting or constant standing and elicited testimony about other aspects of his previous work. (R. at 49-50.) Also during the hearing, Plaintiff's attorney and mother both noted that, before his alleged disability, Plaintiff "had a nice job." (R. at 71, 75.) Second, the ALJ acknowledged Plaintiff's work history in her decision, finding that Plaintiff could not perform his past relevant work as a maintenance mechanic helper. (R. at 30.)

Although the ALJ did not explicitly reference Plaintiff's work history in the credibility determination, the ALJ considered Plaintiff's work history at the hearing and acknowledged it in her opinion. (R. at 30, 49-50, 71, 75.) Further, the ALJ supported her credibility determination with other record evidence, such as testimony and function reports documenting Plaintiff's ability to take care of his own needs, microwave food, drive, shop and hang out with others. (R. at 27.) The ALJ discussed Plaintiff's improvement with medication and treatment, as well as the normal findings on Plaintiff's physical and mental status exams. (R. at 25-27.) Further, no exceptional circumstance exists in the record to prompt the Court not to give the mandated deference to the ALJ's credibility determination. *Eldeco, Inc.*, 132 F.3d at 1011. Accordingly,

the ALJ's failure to reference Plaintiff's work history in the credibility determination does not constitute reversible error.

## C. The ALJ Erred by Failing to Follow the Special-Technique Regulation.

Plaintiff argues that the ALJ did not adequately account for Plaintiff's mental impairments in the RFC. First, relying on the Fourth Circuit's decision in *Mascio*, Plaintiff alleges that the ALJ failed to account for Plaintiff's moderate limitations in concentration, persistence and pace. (Pl.'s Mem. at 15-17.) *Mascio* requires remand where an ALJ finds that a claimant has moderate limitations with concentration, persistence or pace, but, without explanation, fails to account for those limitations in the claimant's RFC. 780. F.3d at 636. Defendant responds that the ALJ did not actually find that Plaintiff had moderate difficulties in concentration, persistence and pace; therefore, *Mascio* does not apply. (Def.'s Mem. at 25.) Second, Plaintiff argues that the ALJ erred by failing to include all of the limitations found by state agency psychological consultant Dr. Richard Luck, Ph.D., in the RFC, despite affording Dr. Luck's opinion substantial weight. (Pl.'s Mem. at 17-18.) Defendant responds that the ALJ did not give substantial weight to Dr. Luck's entire opinion, and that the ALJ properly evaluated Plaintiff's mental impairments when formulating the RFC. (Def.'s Mem. at 26-28.)

Arguing that the ALJ made no finding as to Plaintiff's limitations in concentration, persistence or pace, Defendant relies on this Court's decision in *Brown-Mayo v. Colvin*, No. 3:15cv86 (E.D. Va. Jan. 5, 2016) (ECF No. 18), *R. & R. adopted*, No. 3:15cv86 (E.D. Va. Jan. 29, 2016) (ECF No. 19). (Def.'s Mem. at 25-26.) Like the ALJ here, the ALJ in *Brown-Mayo* did not make a specific finding as to the plaintiff's difficulties with concentration, persistence and pace at step three. (R. at 28); *Brown-Mayo*, slip op. at 7. The ALJ in *Brown-Mayo* "merely stated that [the plaintiff] *self-reported* moderate limitations with regard to concentration,

persistence or pace. . . . [the ALJ] did not turn that self-reporting into a finding. Rather, the rest of the sentence discredits [the plaintiff's] self-reported limitations by listing her self-reported daily activities." *Brown-Mayo*, slip op. at 7 (emphasis added). Thus, *Mascio* did not apply to Brown-Mayo's claim. *Id.*

Likewise here, the ALJ stated, "[w]ith regard to concentration, persistence or pace, [Plaintiff] has moderate difficulties by *self-report* but he needs no reminders for his personal care, watches television all day, follows oral and written instructions without difficulty, reads . . . and uses the internet at the library[.]" (R. at 23 (emphasis added).) Defendant correctly points out that, because the ALJ did not explicitly translate Plaintiff's self-reported limitations into a specific finding at step three, *Mascio* does not apply. (Def.'s Mem. at 26.) However, the Court's analysis does not end there.

After this Court decided *Brown-Mayo*, the Fourth Circuit held that an ALJ's failure to follow the special-technique regulation set forth in 20 C.F.R. § 404.1520a constituted reversible error. *Patterson v. Comm'r of Soc. Sec.*, 846 F.3d 656, 662-63 (4th Cir. 2017.) The Fourth Circuit explained that "[t]he special-technique regulation affects how an ALJ evaluates and documents [her] process at steps 1 through 4 if the claimant alleges a *mental* impairment. When evaluating and documenting the severity of a claimant's mental impairment at steps 2 and 3—and its concomitant impact on the RFC assessment relevant to step 4—the ALJ '*must* follow [the] special technique.'" *Id.* at 659 (quoting § 404.1520a(a)) (emphasis in original).

The special-technique regulation requires the following: if the ALJ determines that a mental impairment exists, the ALJ "must also document 'a specific finding as to the degree of limitation in each of' the four areas of functional limitation[.]" *Patterson*, 846 F.3d at 659 (quoting § 404.1520a(e)(4)). The four areas include: (a) activities of daily living; (b) social

functioning; (c) concentration, persistence or pace; and, (d) episodes of decompensation. *Id.*
The ALJ must rate the first three areas on a five-point scale of "none, mild, moderate, marked,
and extreme," and the last area on a scale of "none, one or two, three, four or more." *Id.*
Additionally, the ALJ must "specify the symptoms, signs, and laboratory findings that
substantiate the presence of the impairment(s) and document [her] findings." *Id.* (internal
citation omitted).

Put simply, the special-technique demands that the ALJ (1) rate and (2) explain. *See*
*Hopkins v. Berryhill*, 2017 WL 6398181, at *17 (D.S.C. Nov. 21, 2017), *R. & R. adopted*, 2017
WL 6366879 (D.S.C. Dec. 12, 2017) (an ALJ's duty to document the special-technique consists
of two elements — (i) rating the four areas of functional limitation and (ii) explaining how the
ALJ determined each degree of limitation). Next, the ALJ must determine whether the mental
impairment qualifies as severe and, if so, whether it meets or medically equals a listed
impairment. *Patterson*, 846 F.3d at 659 (citing § 404.1520a(d)). For severe, but not listed
impairments, the ALJ must assess the claimant's RFC and account for how the impairment
affects the claimant's work abilities. *Id.* The Fourth Circuit emphasized that the ALJ "must
document *all* of the special technique's steps. *Id.* (emphasis in original.)

The ALJ in *Patterson* found that the plaintiff had severe mental impairments that did not
meet or equal any listed impairment. *Id.* at 660. While the ALJ discussed the findings of two
doctors in reaching his conclusions at step three, the ALJ did not follow the special-technique.
*Id.* Specifically, the ALJ failed to (i) rate Patterson's four areas of functional limitation and (ii)
"explain how he reached his conclusions." *Id.* at 662.

Because the special-technique regulation "implicates the validity of so many of the ALJ's
conclusions[,]" the Fourth Circuit ultimately held that the ALJ's failure to follow the special-

technique did not constitute harmless error. *Id.* at 662. The court explained that "the weight of authority suggests that failure to properly document application of the special technique will rarely, if ever, be harmless because such a failure prevents, or at least substantially hinders, judicial review." *Id.* at 662. To that end, the court explained that "because we cannot review the ALJ's mental-impairment evaluation, we cannot say that he properly assessed Patterson's RFC . . . . And because we cannot gauge the propriety of the . . . RFC assessment, we cannot say that substantial evidence supports the ALJ's denial of benefits." *Id.*

Here, the ALJ's failure to specifically rate Plaintiff's limitations in concentration, persistence and pace similarly frustrates the Court's review and requires remand. *Compare Patterson*, 846 F.3d at 662-63 (remanding because the ALJ failed to rate the four areas of functional limitations and explain how he weighed relevant and conflicting evidence) *with Whitfill v. Comm'r, Soc. Sec. Admin.*, 2017 WL 2312866, at *2 (D. Md. May 26, 2017) (finding harmless error where the ALJ assigned ratings to the four functional areas and included fact-based analysis of the claimant's limitations, but failed to address moderate limitations included in the opinions of state agency physicians); *see also Huffman v. Berryhill*, 2017 WL 3097159, at *6 (S.D.W. Va. July 20, 2017) (affirming where the ALJ rated the four broad areas of functioning and sufficiently explained the reasoning for her findings); *Hopkins*, 2017 WL 6398181, at *17 (remanding because, although the ALJ rated the degree of limitation in each of the four broad functional areas, the ALJ failed to reference specific evidence to explain each finding). Although the ALJ explained why Plaintiff's mental impairments did not qualify as severe, the ALJ failed to rate Plaintiff's difficulties with concentration, persistence and pace. (R. at 23, 29.) Consequently, the Court "cannot fill in the blanks for the ALJ in the first instance." *Patterson*, 846 F.3d at 662.

The ALJ's error precludes the Court's ability to review the propriety of the RFC, and thus the ALJ's ultimate decision that Plaintiff does not qualify as disabled. Because the ALJ failed to properly apply the special-technique, her decision necessitates remand.[6]

V. CONCLUSION

For the reasons set forth above, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 11) be GRANTED, that Defendant's Motion for Summary Judgment (ECF No. 13) be DENIED and that the final decision of the Commissioner be VACATED and REMANDED for reasons consistent with this Report and Recommendation.

Let the clerk forward a copy of this Report and Recommendation to United States District Judge Henry E. Hudson and to all counsel of record.

**NOTICE TO PARTIES**

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

                                                            /s/
                                            David J. Novak
                                            United States Magistrate Judge

Richmond, Virginia
Date: February 21, 2018

---

[6]     Because the ALJ did not fully apply the special-technique, the Court also cannot review whether the ALJ properly adopted only some of the limitations from the opinion of the state agency psychologist. Those limitations implicate Plaintiff's mental abilities, and as stated above, the ALJ's error precludes the Court from a meaningful review of her assessment of Plaintiff's mental impairments.